UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THOMAS FELTON, JR.,

     Plaintiff,

  v.

MONROE COMMUNITY COLLEGE,
and JEFFREY DUNKER,

     Defendants.
_____

**DECISION AND ORDER**

6:20-CV-06156 EAW

## <u>INTRODUCTION</u>

*Pro se* plaintiff Thomas Felton, Jr. ("Plaintiff") brings this action asserting claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, New York Executive Law § 290, *et seq.* ("NYSHRL"), alleging that defendants discriminated against him based on his race. (Dkt. 1). Presently before the Court is a motion filed by defendants Monroe Community College ("MCC") and Jeffrey Dunker ("Dunker") (collectively, "Defendants") for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. 55). For the reasons explained below, Defendants' motion for summary judgment is granted, and Plaintiff's complaint is dismissed.

## PROCEDURAL HISTORY

Plaintiff filed his complaint on March 16, 2020, asserting discrimination claims and related state-law claims. (Dkt. 1). After the resolution of various motions to dismiss, what remains pending are the following: (1) as against MCC, Plaintiff's race discrimination and retaliation claims pursuant to Title VII and the NYSHRL, and a claim for breach of contract, and (2) as against Dunker, Plaintiff's discrimination and retaliation claims brought pursuant to the NYSHRL.

The matter was referred to the Hon. Marian W. Payson, United States Magistrate Judge, for the handling of non-dispositive matters. (Dkt. 26). After the close of discovery and in accordance with the deadline set by Judge Payson, on January 22, 2024, Defendants filed their motion for summary judgment. (Dkt. 55). Plaintiff filed his response papers on February 22, 2024 (Dkt. 58), and Defendants replied on March 7, 2024 (Dkt. 59).

## FACTUAL BACKGROUND

The following facts are taken from Defendants' Statement of Material Facts (Dkt. 55-35), Plaintiff's opposition thereto (Dkt. 58-1), and other evidence submitted by the parties.

While Plaintiff has submitted an opposing statement of facts, he has not organized his statement in consecutively numbered statements responding to Defendants' statement of facts, as required by Rule 56(a)(2) of the Court's Local Rules of Civil Procedure. *See* L. R. Civ. P. 56(a)(2) ("The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and

concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried.")).  Plaintiff was informed of the Local Rules and that he was required to submit a separate, short, and concise statement of material facts as to which he contended there was a genuine issue to be tried (*see* Dkt. 57); but Plaintiff's opposing statement of facts consists of two paragraphs of information, with no numbered paragraphs.[1]

More problematic is that much of Plaintiff's opposing statement of facts does not address the facts offered by Defendants or pertain to his claims specifically—rather, the statement contains allegations against defendants who have already been dismissed from this case (*see, e.g.*, Dkt. 58-1 at 1 (complaining that Mr. Rotenberg "lowered the rigor of the P-Tech program," and that he "is not an advocate for students of color")), or sweeping statements of purported racism at MCC (*see id.* at 2 (stating that discussions over Plaintiff's course assignments are "important," but "are kindling and only get the fire started," and "[t]he raging fire . . . is contained in the college's system of institutional racism")).

---

[1]     Plaintiff has also failed to file a memorandum of law containing relevant factual and legal argument, which is required by the Local Rules.  *See* L. R. Civ. P. 7(a)(2).  Rather, Plaintiff has filed a two-page document, which asks that the Court consider as his memorandum of law documents that he filed previously in the case, including the complaint, oppositions in response to Defendants' motions to dismiss, the Court's Decision and Order filed at Docket 41, and an Order & Amended Scheduling Order filed at Docket 53.  (*See* Dkt. 58-2).  There are at least two problems with Plaintiff's request.  First, if the Court were to consider all these documents as Plaintiff's memorandum of law, the memorandum would far exceed the 25-page limitation set in Rule 7(a)(2)(C), and Plaintiff has not made a request to exceed the page limitation.  Second, Plaintiff's blanket citation to these previously filed documents fails to constitute legal or factual argument, and it is not the Court's function to make or interpret arguments for a litigant.

Therefore, to the extent supported by admissible evidence and not otherwise contradicted by the record, the factual statements contained in Defendants' statement of facts are considered admitted for purposes of the motion. *See* L. R. Civ. P. 56(a)(2); *see also N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) ("district courts have the authority to institute local rules governing summary judgment submissions" although "[r]eliance on a party's statement of undisputed facts may not be warranted where those facts are unsupported by the record"). But to be clear, considering Plaintiff's *pro se* status, the Court in its discretion has conducted an independent review of the record to ascertain whether disputes of material fact exist that would preclude summary judgment in favor of Defendants. *See Daley v. Cablevision Sys. Corp.*, No. 12-cv-6316 (NSR), 2016 WL 880203, at *1 (S.D.N.Y. Mar. 7, 2016), *aff'd*, 675 F. App'x 97 (2d Cir. 2017). In other words, given Plaintiff's *pro se* status, the Court has nonetheless reviewed and considered Plaintiff's submissions in opposition to summary judgment,[2] his complaint, and his deposition testimony to determine whether there are disputed issues of material fact.

## A.    MCC, Adjunct Faculty, and the Collective Bargaining Agreements

MCC is a multi-disciplinary community college located in and around Rochester, New York. (Dkt. 55-35 at ¶ 1). MCC offers degrees and certifications in various academic programs and the courses are taught by a combination of full-time, part-time, and adjunct

---

[2]    For example, Plaintiff has submitted in opposition to Defendants' motion for summary judgment a document entitled "Opposing Affidavits and Exhibits," in which he responds to some of the affidavits submitted by Defendants. (Dkt. 58). The Court has considered it in connection with resolving the instant motion.

faculty.  (*Id*. at ¶¶ 2-3).  Adjunct faculty are not full-time or part-time employees of MCC; rather, they are external subject matter experts who typically teach a small number of courses per semester, and often have other full-time or part-time employment.  (*Id*. at ¶ 4). The terms and conditions of employment for faculty are governed by collective bargaining agreements that are negotiated between the Faculty Association of Monroe Community College (the "Union") and the MCC Board of Trustees.  (*Id*. at ¶ 5).

The two collective bargaining agreements relevant here were in effect from September 1, 2015, through August 31, 2018 (the "2015 CBA"), and from September 1, 2018, through August 31, 2020 (the "2018 CBA").  (*Id*. at ¶ 6).  Both the 2015 CBA and 2018 CBA include Article 32, titled "Adjunct Faculty."  (*Id*. at ¶ 7).  Article 32, Section C addresses when and how adjunct faculty are assigned courses and provides, "[a]fter full-time and part-time faculty have satisfied their base load and after the overload requirements of full-time faculty are met, the balance of the courses will be staffed by adjunct faculty." (*Id*. at ¶ 8).  Article 32, Section C also provides that "an adjunct faculty member with five (5) years continuous teaching services at MCC ***and*** ninety (90) [contact hours] of MCC experience will be assigned to at least one course per semester, including summer."  (*Id*. at ¶ 9).  This is referred to as "senior adjunct status," and senior adjunct status does not guarantee assignment of any particular course, but rather only guarantees assignment of at least one course per semester.  (*Id*. at ¶ 10).  Further, Article 32, Section B(5) addresses announcements for full-time vacancies to adjunct faculty members: "When a full time vacancy occurs, such vacancies shall be posted on the College's website and the College's posting boards."  (*Id*. at ¶ 11).  Finally, Article 44, entitled "Grievance Procedures,"

identifies the procedures for processing "any complaint by a person covered by the Agreement, the College or Faculty Association on its own behalf, that there has been a violation, misinterpretation or inequitable application of any of the provisions of this Agreement." (*Id*. at ¶ 12; Dkt. 55-19 at 47).

## B.    The Department of Information and Computer Technologies

MCC's Department of Information and Computer Technologies ("ICT") offers degree and certificate programs in computer science, computer systems technology, information and network technology, information technology, and office technology. (Dkt. 55-35 at ¶¶ 13-14). ICT courses are taught by a combination of full-time, part-time, and adjunct faculty. (*Id*. at ¶ 16). Since July 1, 2017, the Chairperson of ICT has been Jeffrey D. Dunker. (*Id*. at ¶ 17). Dunker is responsible for determining the ICT course schedule and for assigning faculty to teach ICT courses each semester in accordance with the collective bargaining agreement. (*Id*. at ¶ 18).

Dunker uses a standard process to assign courses to adjunct faculty each semester. (*Id*. at ¶ 19). He first assigns courses to full-time and part-time faculty. (*Id*. at ¶ 20). Once those assignments are made, Dunker evaluates what course offerings still need instructor assignments. (*Id*.). Dunker evaluates the individual skillset and resume experience of the adjunct faculty available, as well as the adjunct faculty members' history, availability, and preferences. (*Id*.). As part of this step, Dunker now uses a standard form (the "Availability Form"), which asks each adjunct faculty member to identify what course(s) they would prefer to teach in the upcoming semester and when they are available to teach. (*Id*. at ¶ 21). Dunker sends the Availability Form out in the preceding semester to gauge interest and

availability for the upcoming semester.  (*Id*. at ¶ 22).  Dunker cannot, and does not, guarantee any adjunct faculty member assignment to any class in any semester, including due to changing course schedules.  (*Id*. at ¶ 26; *see also* Dkt. 55-34 at 25 (Plaintiff's agreement that as an adjunct, he is not guaranteed any particular course)).

### C.   Plaintiff's Employment as an MCC Adjunct Faculty Member and Assignment of the Spring 2019, Fall 2019, and Spring 2020 "Intro to Linux" Course

Plaintiff, an African American male, began working as an adjunct professor at MCC in the ICT department in 2010.  (Dkt. 1 at 7; Dkt. 55-35 at ¶ 29).  According to Plaintiff, he was hired as an "Alice Young Intern," as part of an internship designed to provide students with learning opportunities from a diverse faculty.  (Dkt. 1 at 9).  Plaintiff also served as a project coordinator for the "SUNY High Needs Grant," to increase diversity in mobile and cloud computing.  (*Id*. at 7).  During his time as an adjunct faculty member, Plaintiff has taught many different courses, including "Practical Computer Literacy," "Microsoft Office," "Intro to Web Site Design," "Surfing the Internet," "Introduction to Networks," "Network Perimeter Security," "Intro to Linux," and "Intro to Cybersecurity." (Dkt. 55-35 at ¶ 30).  Plaintiff has not taught courses consistently in each semester since he was first hired; for example, Plaintiff did not teach courses in the Fall 2014, Spring 2015, Spring 2016, Spring 2019, Fall 2019, Spring 2021, or Spring 2022 semesters.  (*Id*. at ¶ 31).  In addition, there were issues with Plaintiff's performance during Dunker's tenure as ICT Department Chair.  (*Id*. at ¶¶ 32-33).  At his deposition, Plaintiff discussed some of these issues, including a complaint from a student about grades being entered late.  (*See, e.g.*, Dkt. 55-34 at 53-59).

During the Fall 2018 semester Dunker prepared the schedule and instructor assignments for the Spring 2019 semester. (Dkt. 55-35 at ¶ 35). One of the courses Dunker was scheduling for the Spring 2019 semester was "Intro to Linux." (*Id*. at ¶ 36). At that time, "Intro to Linux" was being taught by two different ICT adjunct faculty members, Harry Payne and Plaintiff. (*Id*.). Mr. Payne is an ICT adjunct faculty member who had been teaching courses in ICT since 2016. (*Id*. at ¶ 37). Mr. Payne is a retired Unix Systems Administrator from Kodak with many years of professional experience and, like Plaintiff, is African American. (*Id*. at ¶ 38). Prior to the Spring 2019 semester, Mr. Payne had taught "Intro to Linux" in the Fall 2017, Spring 2018, and Fall 2018 semesters, whereas Plaintiff had only taught "Intro to Linux" in the Spring 2017 and Spring 2018 semesters. (*Id*. at ¶ 39).

As Dunker considered the schedule for Spring 2019, he decided to move the "Intro to Linux" course from Saturdays to weekdays, including due to student feedback and enrollment issues. (*Id*. at ¶ 40). At the time he made this change, Dunker believed that Mr. Payne was able to teach weekday/daytime courses, but Plaintiff was not available due to his outside full-time employment. (*Id*. at ¶ 43). Because Mr. Payne had more experience teaching the "Intro to Linux" course than Plaintiff, and because Dunker believed Plaintiff was not available to teach weekday courses, Mr. Payne was assigned to teach the Spring 2019 "Intro to Linux" course. (*Id*. at ¶ 44).

On October 8, 2018, Dunker offered Plaintiff the opportunity to teach the "Intro to Cybersecurity" weekend course for the Spring 2019 semester, which Plaintiff had also taught in the past. (*Id*. at ¶ 45). But the Spring 2019 "Intro to Cybersecurity" weekend

course Plaintiff was offered was cancelled due to low enrollment, and Plaintiff was not able to teach it.  (*Id*. at ¶ 46).  On November 28, 2018, Dunker offered Plaintiff another ICT course, "Introduction to Keyboarding," so that he would have at least one course to teach during the Spring 2019 semester.  (*Id*. at ¶ 47).

On November 30, 2018, Plaintiff emailed Dunker stating that he felt he was being pushed out of ICT because the Spring 2019 "Intro to Linux" course had been moved to weekdays and assigned to Mr. Payne.  (*Id*. at ¶¶ 48-49).  In this email, Plaintiff also accepted the offer to teach the "Introduction to Keyboarding" class in the Spring 2019 semester.  (*Id*. at ¶ 50).  Dunker tried to call Plaintiff to discuss his concerns but was unable to connect.  (*Id*. at ¶ 52).  Dunker also wrote Plaintiff an email on December 5, 2018, in which he explained that he felt bad that the "Intro to Cybersecurity" course had been cancelled due to low enrollment, but that ICT had seen many courses cancelled due to low enrollment that semester, which impacted both full-time and adjunct faculty.  (*Id*. at ¶ 53).  Dunker also confirmed that he would be utilizing a formal availability sheet for adjunct professors beginning in the following semester.  (*Id*. at ¶ 54).

The first day for the "Intro to Keyboarding" class Plaintiff had accepted was scheduled for Tuesday, March 5, 2019.  (*Id*. at ¶ 56).  On Friday, March 1, 2019, Plaintiff notified Dunker via email that he could not teach the "Introduction to Keyboarding" course due to his full-time employment with the Rochester City School District.  (*Id*. at ¶ 57; *see also* Dkt. 55-34 at 141-45 (Plaintiff's testimony that he cancelled the keyboarding class on the eve of starting, due to a conflict with his full-time job)).  Plaintiff's last-minute cancellation was problematic, since ICT had students registered to take the "Introduction

to Keyboarding" course who were ready to start on Tuesday, March 5.  (Dkt. 55-35 at ¶ 58).  Dunker was able to find a last-minute replacement, but this was a significant issue. (*Id*. at ¶ 59).

On March 19, 2019, Dunker sent all ICT adjunct faculty, including Plaintiff, an email with the Availability Form attached for the assignment of Fall 2019 courses.  (*Id*. at 61).  In the email to ICT adjuncts, Dunker stated that the form had to be returned to him "by **NOON on Friday, April 5th, 2019**." (*Id*.).  The Availability Form also clearly stated: "This form is a tool to streamline communication of teaching preferences between the adjunct and department only.  Individual course offerings made by ICT are based on fulfilling department master scheduling needs and may not reflect any or all preferences requested by the adjunct." (*Id*. at ¶ 62).  Dunker's email gave adjunct faculty 17 days to provide their preferences, and as adjunct faculty returned their completed Availability Forms, Dunker began assigning Fall 2019 courses.  (*Id*. at ¶¶ 63-64).  On April 5, 2019, at 5:02 p.m.—after the deadline of noon on April 5, and after Dunker had assigned many of the courses—Plaintiff returned his completed Availability Form.  (*Id*. at ¶ 65; *see also* Dkt. 55-34 at 148-49 (Plaintiff's testimony that he submitted his Availability Form after the deadline)).  Dunker emailed Plaintiff and notified him that he had already assigned his requested courses, but he would consider the late submission and let him know if any additional adjunct faculty needs were identified.  (Dkt. 55-35 at ¶ 66).  According to the 2018 CBA, which was in effect at the time, Dunker could not un-assign courses once they had already been assigned.  (*Id*. at ¶ 67).  Plaintiff did not teach any courses during the Fall 2019 semester.

On October 8, 2019, Dunker emailed ICT adjunct faculty asking for their availability and preferences for course assignments during the Spring 2020 semester; the email again attached the Availability Form and requested completed forms be returned "by **NOON on Wednesday October 16, 2019**." (*Id*. at ¶ 69).   On October 14, 2019, at 6:00 p.m., Plaintiff emailed Dunker, attaching his completed Availability Form.  (*Id*. at ¶ 70).  In the email, Plaintiff noted that Dunker had already assigned the Spring 2020 "Intro to Linux" course to Mr. Payne, and also asked why the assignment was made before the October 16, 2019 deadline for submissions.  (*Id*. at ¶ 71; *see also* Dkt. 55-16).

In his declaration filed in support of Defendants' motion for summary judgment, Dunker explained that he does not wait for all submissions to begin assigning courses, and he has never represented to ICT faculty that he did.  (Dkt. 55-35 at ¶ 72; *see also* Dkt. 55-1).  Rather, once Dunker receives feedback from the adjunct faculty, he begins assigning courses and, by the time Plaintiff submitted his Availability Form, Dunker had already assigned the "Intro to Linux" course for the Spring 2020 semester to Mr. Payne.  (Dkt. 55-35 at ¶¶ 73-74).  At his deposition, Plaintiff agreed that Dunker never told him that he waited until he received all the Availability Forms to start assigning courses.  (Dkt. 55-34 at 155).

Approximately 24 minutes after sending his first email to Dunker on October 14, 2019, Plaintiff sent a second email which attached an updated Availability Form that included a request to teach "Intro to Cybersecurity" during the Spring 2020 semester. (Dkt. 55-35 at ¶ 76).  Because that section was still available, the next day, October 15, 2019, Dunker offered it to Plaintiff to teach.  (*Id*. at ¶ 77).  In Dunker's email offering the

assignment to Plaintiff, he noted that Plaintiff needed to verify he could teach the course and that he would not have any conflicts with his full-time employment at the Rochester City School District. (*Id*. at ¶¶ 78-79). Plaintiff accepted the assignment and taught "Intro to Cybersecurity" in the Spring 2020 semester. (*Id*. at ¶ 80; Dkt. 55-34 at 156-59).

Plaintiff has continued working for MCC, and he has been a regular instructor in ICT and has continued teaching courses since the Spring 2020 semester. (Dkt. 55-35 at ¶ 81). Plaintiff taught "Intro to Linux" in the Fall 2020 semester, and he has also taught "Intro to Cybersecurity" in the Fall 2021, Fall 2022, Spring 2023, Fall 2023, and Spring 2024 semesters. (*Id*. at ¶ 82).

### D.   Plaintiff's Meeting with Human Resources and Filing Administrative Charges

In or around December 2018, shortly after exchanging emails with Dunker about the scheduling of the "Intro to Linux" course for the Spring 2019 semester, Plaintiff met with representatives of MCC's Human Resources department, including Melissa Fingar and Kristin Lowe, to discuss his concerns about the ICT course scheduling process. (*Id*. at ¶ 84). During this meeting, Plaintiff expressed his belief that he was not scheduled to teach the Spring 2019 "Intro to Linux" course due to his race. (*Id*. at ¶ 85). According to Defendants, Plaintiff had no basis for his claim that race played a role in the scheduling decision, particularly where the course was assigned to Mr. Payne, who is also African American. (*Id*. at ¶ 86). While Ms. Fingar and Ms. Lowe did not find any evidence of discrimination, they were sensitive to Plaintiff's concerns and wanted to work with him and the ICT Department to improve how adjunct assignments were made. (*Id*. at ¶¶ 87-88;

*see also* Dkt. 55-28 at ¶¶ 5-6 (Declaration of Kristin M. Lowe, Esq., former Executive Director, Human Resources & Organizations Development for MCC)).  On February 15, 2019, Ms. Fingar emailed Plaintiff explaining the steps that they were taking to address communication issues.  (Dkt. 55-35 at ¶ 89).  In this email, Ms. Fingar told Plaintiff that MCC did not tolerate retaliation, and asked Plaintiff to notify her if he felt he was being retaliated against.  (*Id*. at ¶ 90).  Plaintiff did not make any more internal complaints to MCC of discrimination.  (*Id*. at ¶ 91).

On February 18, 2020, Plaintiff filed an improper practice charge against his Union, which alleged that the Union failed to adequately represent his interests in violation of Section 209-a.2(c) of the Public Employees' Fair Employment Act.   (*Id*. at ¶ 92).  A hearing was conducted related to the charge before the Public Employment Relations Board ("PERB") on August 11, 2021, and September 22, 2021.  (*Id*. at ¶ 94).  Following the hearing, a decision was issued by Administrative Law Judge Joseph E. O'Donnell on April 26, 2022, which dismissed Plaintiff's charge in its entirety.  (*Id*. at ¶ 95; *see also* Dkt. 55-34 at 91 (Plaintiff's deposition testimony that he filed a claim against his union, he had a hearing with PERB, and his PERB complaint was dismissed)).

Plaintiff also filed a Charge of Discrimination against MCC with the United States Equal Employment Opportunity Commission ("EEOC"), which Plaintiff signed on December 7, 2019.  (Dkt. 55-35 at ¶ 98; *see also* Dkt. 55-34 at 196 (Plaintiff's agreement that he signed his EEOC charge on December 7, 2019)).  The EEOC charge was sent to MCC on or about December 15, 2019, and MCC did not have notice of the EEOC charge before that date.  (Dkt. 55-35 at ¶¶ 99-100).  On or about December 19, 2019, before MCC

had an opportunity to respond, the EEOC dismissed Plaintiff's charge, explaining that he could not establish that there was a connection between his race and an unfair work assignment. (*Id*. at ¶¶ 101-03).

### E.   MCC's Advertisement for 2017 Faculty Positions

On or about May 1, 2017, MCC published an advertisement for a "Networking and Cybersecurity, Faculty Member, Full-Time Tenure-Track" position for the Fall 2017 semester. (*Id*. at ¶ 104). MCC sought to fill two openings, and in compliance with the 2015 CBA, the advertisement was posted to MCC's website and posting boards. (*Id*. at ¶¶ 105-06). It was also posted to many online sites. (*Id*. at ¶ 107). Plaintiff did not apply for this position. (*Id*. at ¶ 108). Following the applicant evaluation process, including candidate interviews, the positions were filled by Binh-Yen Nguyen and Candy Shaffer. (*Id*. at ¶ 109). ICT Hiring Committee Chairperson, Kevin Soule, did not provide any faculty, including Plaintiff, Mr. Nguyen, or Ms. Shaffer with individualized notice of these openings. (*Id*. at ¶ 111). MCC did not advertise for or hire any other full-time faculty positions in ICT from 2017, through March 16, 2020, when Plaintiff filed the present complaint. (*Id*. at ¶ 110).

### **DISCUSSION**

### I.   **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court should grant summary judgment if, after considering the evidence in the

light most favorable to the nonmoving party, it finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986) (quotation marks, citations, and footnote omitted). A court's obligation to decide whether the movant is entitled to summary judgment is not extinguished by a party's failure to address an argument advanced by the movant. *See, e.g.*, *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machs. Corp*., 310 F.3d 243, 254 (2d Cir. 2002) (citing *Anderson*, 477 U.S. at 249). "In short, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . .'" *Id*. (quoting *Anderson*, 477 U.S. at 255); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553

(2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).

## II.   Discrimination Claims

### A.  Race Discrimination Claims Under Title VII and the NYSHRL

Title VII and NYSHRL discrimination claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  To establish a claim of racial discrimination, a plaintiff must show: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Id.*  (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  Plaintiff's *prima facie* showing need only be "*de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 467 (2d Cir. 2001).

"Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)).  "Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id*.

Defendants assume for purposes of the pending motion that Plaintiff satisfies the first three requirements for a *prima facie* case and focus on the fourth element—*i.e.*, that the adverse employment action did not occur under circumstances giving rise to an

inference of discriminatory intent.   (*See* Dkt. 55-36 at 27).   Plaintiff contends that Defendants discriminated against him when (1) they did not select him to teach the Intro to Linux class during certain semesters[3] and, relatedly, that this course was moved to weekdays when Plaintiff was unable to teach it, and (2) when Defendants did not notify or select Plaintiff for two full-time teaching positions, which were filled by an Asian man and a white woman.[4]

For both the assignment of the Intro to Linux course and the full-time teaching positions, Plaintiff has failed to identify any evidence supporting a reasonable inference that Defendants took adverse action against him based on his race.  Plaintiff testified at his deposition that neither Dunker, nor anyone else employed by MCC responsible for assigning him courses, ever made comments to him that were racially insensitive.  (Dkt.

---

[3]   It is somewhat unclear during which semesters Plaintiff claims he experienced discriminatory treatment in the assignment of courses.   Based on the allegations in Plaintiff's complaint and his deposition testimony, the Court presumes that Plaintiff alleges discriminatory treatment during the Spring and Fall 2019 semesters and the Spring 2020 semester.

[4]   Plaintiff also claimed at his deposition that he was discriminated against when (1) he was not informed of an open house that took place in his classroom on a Saturday, and therefore he had to move instruction online, and (2) that someone in the MCC parking lot parked too close to his vehicle, and he had to squeeze into his car.  (*See* Dkt. 55-34 at 168-73, 175-77).   Plaintiff has failed to articulate how these actions were allegedly discriminatory (or retaliatory) in nature.   For example, with respect to the open house, Plaintiff claimed that he must have been purposely left off a communication because another professor was aware of the open house.  (*Id*. at 169).   However, Plaintiff admitted that he was not aware of whether Dunker or anyone else at MCC sent any communication regarding the open house—in other words, Plaintiff's belief that he was left off a communication and that this constitutes discrimination amounts to no more than speculation.  (*Id*. at 170-71).   As for the parking situation, Plaintiff could not identify the owner of the car parked next to his vehicle, and he could not articulate how this event was discriminatory in nature.

55-34 at 180; *see also id*. at 138-39).  Plaintiff appears to rely solely on his subjective relief

that he was discriminated against based on his race.  For example, Plaintiff makes sweeping

statements about the "system of racism" at MCC.  (*See* Dkt. 58 at 2; *see also* Dkt. 55-34 at

93 (Plaintiff testifying at his deposition that, as to the reassignment of the Intro to Linux

course to Mr. Payne, "I just believe deep down in my soul that it was racially motivated");

*id*. at 174 (Plaintiff agreeing that he was "throwing around a lot of generalities, a lot of

conclusions," about his discrimination claims)).  However, "a plaintiff's mere subjective

belief that he was discriminated against does not sustain a discrimination claim," *Sethi v.

Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (quotations, citations, and alterations

omitted), and therefore Plaintiff's reliance on his beliefs and generalities, without any

evidence, is not enough to withstand summary judgment.

That the Intro to Linux course was ultimately filled by Mr. Payne—another black

male—further cuts against an inference of discrimination.  *See Gordon-Mallett v. Mt. Sinai

Hosps. Grp., Inc.*, No. 22-cv-1159 (LJL), 2024 WL 1513910, at *13 (S.D.N.Y. Apr. 8,

2024) (explaining that, while not dispositive, an employer is less likely to have engaged in

discrimination "where the individual hired to replace a plaintiff alleging discrimination is

within the same protected class" (citation omitted)); *Ehrbar v. Forest Hills Hosp.*, 131 F.

Supp. 3d 5, 26 (E.D.N.Y. 2015) ("Where an employer replaces a member of the protected

class with another member of the protected class, that fact may undermine any inference

of discrimination."); *Inguanzo v. Hous. & Svcs., Inc.*, No. 12-CV-8212(ER), 2014 WL

4678254, at *19 (S.D.N.Y. Sept. 19, 2014) ("Where a member of the plaintiff's protected

class is contemporaneously hired as a replacement, the offering of proof of intentional

discrimination appears extremely difficult, if not practically impossible." (citation omitted)), *aff'd*, 621 F. App'x 91 (2d Cir. 2015); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 560 (S.D.N.Y. 2005) (the fact that the plaintiff was replaced by at least one other black nurse "weighs heavily against the inference" of discrimination).

Plaintiff offers two theories as to why Defendants' assignment of Mr. Payne to teach the Intro to Linux course does not undermine an inference of discrimination, but neither theory finds support in the record.  First, Plaintiff argues that Defendants wanted to "disrupt and dismantle the IT education and equity pipeline" and while "Mr. Payne may have an industry resume . . . Plaintiff [as the Program Coordinator for the SUNY High Needs Grant to Increase Diversity in Mobile and Cloud Computing] was creating education and industry connections, as well as equity and access to careers in information technology."  (Dkt. 58 at 5).  Plaintiff also argues that Mr. Payne was selected to teach the Intro to Linux course because it was "going to be a soft transfer of sorts," and they wanted to "get a token Black guy to put him in there, right, move the other Black guy out that you don't want. . ."  (Dkt. 55-34 at 91-92).

The Court is not persuaded by either of these arguments.  First, there is no evidence in the record showing that Defendants conspired to replace Plaintiff based on his involvement in the SUNY High Needs Grant program, or that Dunker did not support the program to increase diversity.  Plaintiff's argument about Mr. Paine being a "token black person" fares no better.  Plaintiff offers no evidence supporting that Defendants conspired to replace him with another minority to avoid the appearance of race discrimination, and Plaintiff has failed to identify any other evidence of race discrimination to overcome the

inference that Plaintiff's replacement by Mr. Paine negates the presumption of discriminatory animus.

Even if Plaintiff had established a *prima facie* case of discrimination, he has failed to rebut Defendants' evidence that he was treated in a legitimate, nondiscriminatory manner. Defendants have offered evidence—namely, Dunker's declaration and the associated exhibits—explaining the process for assigning courses and why the Intro to Linux course was not assigned to Plaintiff during certain semesters. (*See, e.g.*, Dkt. 55-1 at ¶ 23 (Dunker assigned Spring 2019 Intro to Linux course to Mr. Payne because he had availability to teach weekday/daytime courses and he had as much experience in teaching that course as Plaintiff); *id.* at ¶ 40 (Plaintiff did not receive Intro to Linux course for Fall 2019 semester because he returned his Availability Form after the deadline for doing so, and after Dunker had assigned many courses, including the courses on Plaintiff's form); *id.* at ¶¶ 45-46 (Plaintiff did not receive Intro to Linux course for Spring 2019 semester because Dunker had already assigned that course on a rolling basis before Plaintiff had returned his completed Availability Form)). The reasons offered by Dunker with respect to the assignment of the Intro to Linux course, including because Plaintiff did not timely return his Availability Form and because the course had already been assigned to Mr. Payne, are legitimate and nondiscriminatory.

In response, Plaintiff has failed to make a showing that the nondiscriminatory reasons offered by Defendants are pretextual. Plaintiff argues that Dunker's asking him about his course availability shows that he was preparing to discriminate against Plaintiff by moving the Intro to Linux course to a time Plaintiff was not available to teach. (*See*

Dkt. 58 at 3 ("Once it was determined that Plaintiff could not teach during the week, Mr. Dunker moved the Intro to Linux class from Saturday to the weekday."); *see also* Dkt. 55-34 at 45-47, 75, 84-85 (describing emails he received from Dunker and Mr. Rotenberg, asking Plaintiff if in his current job he could teach a course or two during the school day)). However, at his deposition Plaintiff admitted that he was not aware of Dunker's process for assigning courses to other adjunct faculty members (*see id*. at 83), and therefore Plaintiff has not presented evidence that Dunker treated him differently than any other faculty member when assigning courses.  Further, in his declaration Dunker explained that "courses are regularly cancelled or moved based upon student feedback and/or enrolling limitations" and provided examples of the same—again, underscoring that Plaintiff was *not* treated differently than other adjunct faculty.  (*See* Dkt. 55-1 at ¶ 31 & Dkt. 55-12 (Exh. K)).  Accordingly, the Court does not find the fact that Defendants asked Plaintiff about his availability creates an issue of fact with respect to any discrimination based on his race.

Plaintiff also contends that he was discriminated against when he was not informed of, or selected for, two full-time ICT teaching positions in 2017, which were ultimately filled by Candy Schaffer and Binh Nguyen.  (*See* Dkt. 55-34 at 182).  At his deposition, Plaintiff explained that he was notified of a full-time faculty position posting in 2016 by an individual named Kevin Soule, and that he applied for that position but was not selected. (*Id*. at 182-83).  However, Plaintiff did not receive a similar notification for the two full-time postings in 2017, and he argues that the failure to notify him was due to race discrimination.  (*Id*.).

Any inference of discrimination is lacking with respect to Plaintiff's claims about the two full-time faculty positions because he has failed to adduce evidence that he was treated differently than any other individuals with respect to these positions. For example, Plaintiff admitted at his deposition that he was not aware of whether or how Mr. Nguyen or Ms. Shaffer received any notification regarding these positions, or if the positions were advertised to other adjunct faculty. (*See* Dkt. 55-34 at 153-57, 184-85). Further, Defendants have submitted the declaration of Mr. Soule, an Associate Professor at MCC and formerly the Chairperson of the ICT Hiring Committee in 2016 and 2017. (*See* Dkt. 55-30). Mr. Soule explained that 2016 was his first year on the hiring committee; because he was not sure what notification had to be provided to adjuncts about full-time faculty postings, out of an abundance of caution, he sent an email to all adjunct faculty about the 2016 posting. (*Id*. at ¶¶ 3-4). Plaintiff applied to this position but was not selected. (*Id*. at ¶ 5). Mr. Soule further explained that, in 2017, MCC had two additional full-time faculty openings, and that an advertisement for these openings was posted online where postings are typically made. (*Id*. at ¶ 6). Mr. Soule did not provide individualized email notification to Plaintiff or to any other adjunct faculty member about the 2017 positions, and Plaintiff did not apply for either position. (*Id*. at ¶¶ 7-8). Mr. Soule's declaration constitutes a legitimate, nondiscriminatory basis as to why Plaintiff was not individually notified of the 2017 job postings. (*See also* Dkt. 55-18 at ¶ 19 (declaration of Tammy Kieper, Executive Director, Human Resources & Organizational Development for MCC, explaining that advertisements for the 2017 full-time faculty openings were posted to MCC's website and posting boards, in compliance with the collective bargaining agreement)).

- 22 -

Plaintiff has not offered any argument as to why Mr. Soule's explanation is pretextual, nor does he otherwise raise an issue of fact with respect to the postings for the 2017 full-time faculty positions.  Rather, Plaintiff cites to Article 32, Section B(5) of the collective bargaining agreements which address announcements for full-time vacancies to adjunct faculty members, including that when a full time vacancy occurs, such vacancies shall be posted on MCC's website and MCC's posting boards (*see* Dkt. 58 at 3)—and by its very terms does not require individualized emails to each adjunct faculty member.  Accordingly, the evidence before the Court is that Plaintiff was not treated any differently than Mr. Nguyen or Ms. Shaffer (or any other adjunct faculty member) with respect to the 2017 full-time faculty postings.

In sum, Plaintiff has failed to present evidence that the assignment of the Intro to Linux course, or the 2017 full-time faculty position postings, were discriminatory.  Rather, Plaintiff's allegations of racial discrimination are based on nothing more than his own assumptions and dissatisfaction with his course assignments, and this is not sufficient to withstand summary judgment.  Put simply, based on the undisputed evidence, no reasonable jury could find in favor of Plaintiff on his discriminations claims.  Thus, Defendants are entitled to summary judgment as to Plaintiff's race discrimination claims.

### B.  Retaliation Claims Under Title VII and the NYSHRL

The Court turns next to Plaintiff's claim that he experienced retaliation in violation of Title VII and the NYSHRL.  At summary judgment, those claims "are analyzed according to the . . . burden-shifting approach applicable to other discrimination claims under *McDonnell Douglas Corp. v. Green*. . . ."  *Kalarickal v. McDonough*, No. 20cv10249

(DLC), 211cv1043 (DLC), 2022 WL 2292735, at *2 (S.D.N.Y. June 24, 2022) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)); *see also Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 543 (N.D.N.Y. 2021) (analyzing retaliation claims under Title VII under burden-shifting framework).  To establish a *prima facie* case of retaliation, Plaintiff must show: "(1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a non-retaliatory rationale for the adverse action and, if the employer can articulate any such rationale, the employee may prevail by demonstrating that the stated rationale is a pretext for retaliation.  *Zann Kwan*, 737 F.3d at 845.

Plaintiff's Title VII retaliation claims are subject to a but-for causation test.[5]  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citing *Univ. of Texas*

---

[5]  Although the Second Circuit has not "conclusively resolved whether the but-for causation standard applies to [retaliation] claims under the NYSHRL," it has "implicitly applied the but-for standard to NYSHRL claims."  *Farmer v. Shake Shack Enterprises, LLC*, No. 19 CIV. 9425 (PAE), 2020 WL 4194860, at *13 n.7 (S.D.N.Y. July 21, 2020) (citations omitted); *Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 462 (S.D.N.Y. 2023) (citing *Heiden v. N.Y. City Health & Hosps. Corp.*, No. 20-CV-10288, 2023 WL 171888, at *22 (S.D.N.Y. Jan. 11, 2023) (concluding that but-for causation applies to NYSHRL retaliation claims)); *see also Henvill v. Metro. Trans. Auth.*, No. 22-2731-cv, 2023 WL 7294702, at *1 (2d Cir. Nov. 6, 2023) (both plaintiff's Title VII and NYSHRL claims required a showing that the protected activity was a but-for cause of the adverse employment action).

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan*, 737 F.3d at 846.

Plaintiff contends that Defendants retaliated against him on two occasions: (1) in April 2019, Dunker advised Plaintiff that he would not honor his Fall 2019 course request, and this was in retaliation for a December 2018 meeting with human resources and the Union to discuss his discrimination complaint, and (2) following his September 2019 EEOC charge, in October 2019, Dunker assigned the Intro to Linux course to Mr. Payne, rather than to Plaintiff.  (*See* Dkt. 1).  Defendants agree that Plaintiff engaged in protected activity, including by filing a charge of discrimination with the EEOC.  (Dkt. 55-36 at 32-33).  However, as further explained below, the record establishes that there is no causal connection between any protected activity and the alleged adverse actions in this case.

Turning first to the April 2019 assignment of the Fall 2019 Intro to Linux course, Dunker has submitted a sworn declaration in support of the motion for summary judgment.  (*See* Dkt. 55-1).  In the declaration, Dunker explains that he did not retaliate against Plaintiff in his assignment of courses, and he was not aware that Plaintiff ever complained of discrimination until this lawsuit was filed.  (*See id*. at ¶¶ 16, 33 (Dunker "was not notified that Plaintiff expressed concerns regarding race discrimination at any time until this lawsuit was filed," and "[a]t the time Plaintiff's concerns were raised, [he] was notified by Human Resources that Plaintiff felt there were issues with the course assignment process, but [he] was not aware [Plaintiff] was claiming they were related to his race.")).  The second

element of a *prima facie* case requires that the employer be aware that the plaintiff engaged in protected activity.  Because Dunker was not aware that Plaintiff engaged in protected activity by complaining about race discrimination—a fact which stands uncontested by Plaintiff—Plaintiff has failed to demonstrate a *prima facie* case for his retaliation claim against Dunker.

Further, in his declaration Dunker explains that for the Fall 2019 semester, Plaintiff did not receive the course assignments he selected on his Availability Form because he was not timely in returning the form.  (Dkt. 55-1 at ¶¶ 37-43).  Plaintiff does not dispute that he was late returning his form.  (*See* Dkt. 55-34 at 148-49 (Plaintiff's testimony that he submitted his Availability Form after the April 5, 2019 deadline)).  Accordingly, any alleged retaliation cannot be the cause—let alone the but-for cause—of Plaintiff's not being assigned to teach the Intro to Linux course.  In response, Plaintiff has failed to offer any evidence creating an issue of fact with respect to Dunker's explanation for the assignment of the Intro to Linux course for the Fall 2019 semester.  Regardless of Plaintiff's disagreement that he should have been selected to teach the Intro to Linux class, Defendants' reason for not selecting Plaintiff to teach the class—including because Plaintiff did not timely return his form—constitutes a non-retaliatory basis for the assignment of the course.  *See, e.g.*, *Rumsey v. Ne. Health, Inc.*, 89 F. Supp. 3d 316, 338-39 (N.D.N.Y. 2015) ("Regardless of the intensity of the disagreement, however, the disagreement is a non-retaliatory basis for terminating plaintiff's employment."), *aff'd*, 634 F. App'x 318 (2d Cir. 2016).

Finally, the Court finds that the five months that elapsed between the December 2018 meeting with human resources and the April 2019 assignment of the Fall 2019 Intro to Linux course is too attenuated to establish causation.  "A plaintiff may establish a causal connection either through direct evidence of retaliatory animus or indirectly through circumstantial evidence," and "[w]here there is no direct evidence of retaliatory animus, proof of causation may be shown indirectly by demonstrating that the protected activity was followed closely by a retaliatory action."  *Russell v. Aid to Developmentally Disabled, Inc.*, 416 F. Supp. 3d 225, 235-36 (E.D.N.Y. 2017).  While "[t]here is no firm outer limit to the temporal proximity required . . . most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."  *Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 59-60 (S.D.N.Y. 2021) (citation omitted); *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 353 (S.D.N.Y. 2010) ("most courts addressing the issue have found a five month lapse too attenuated to support the finding of a causal connection").  Plaintiff has failed to identify any direct evidence of retaliatory animus, and in the absence of such evidence, the five-month time gap between the December 2018 meeting with human resources and Dunker's April 2019 rejection of Plaintiff's Fall 2019 course request is not sufficient to establish a causal connection between those two events.

There is also a lack of causation between Plaintiff's EEOC charge and the October 2019 assignment of the Spring 2020 Intro to Linux course to Mr. Payne.  Although Plaintiff alleged in his complaint that he filed his EEOC charge in September 2019 (*see* Dkt. 1 at 3), the evidence before the Court establishes that Plaintiff filed his charge in December

2019, and MCC was not notified of Plaintiff's EEOC charge until December 15, 2019, *after* the last retaliatory action identified by Plaintiff—*i.e.*, after the October 2019 assignment of the Spring 2020 Intro to Linux course.   Defendants submit the declaration of Ms. Kieper, stating that Plaintiff filed his EEOC charge on December 7, 2019, and MCC did not receive notice of the EEOC charge until December 15, 2019.   (*See* Dkt. 55-18 at ¶¶ 27-28; *see also* Dkt. 55-24 (Plaintiff's EEOC charge, dated December 7, 2019); Dkt. 55-34 at 196 (Plaintiff's agreement that he signed his EEOC charge on December 7, 2019)). Defendants could not have retaliated against Plaintiff for something that had not yet occurred.   *See*, *e.g.*, *Zenie v. Coll. of Mt. St. Vincent*, No. 18-CV-4659 (JMF), 2020 WL 5518144, at *7 (S.D.N.Y. Sept. 14, 2020) ("Needless to say, a plaintiff cannot bring a retaliation claim where the alleged retaliation took place before the plaintiff's protected activity."), *aff'd*, No. 20-3535-CV, 2021 WL 6105373 (2d Cir. Dec. 21, 2021).

As referenced above, Plaintiff has failed to submit any evidence creating an issue of fact with respect to his retaliation claims.   Plaintiff does not deny that his Fall 2019 Availability Form was submitted in an untimely fashion, nor does he argue that Dunker was aware of discrimination complaints before assigning Plaintiff courses.   While Plaintiff attempts to argue that Dunker's assignment of the Intro to Linux course before the course preferences deadline itself demonstrates that Dunker's actions were retaliatory (Dkt. 58 at 7), Plaintiff has failed to offer any evidence supporting this conclusory assertion.   Rather, Plaintiff submits an email dated October 10, 2019, between himself and Ms. Fingar, in which Plaintiff asks Ms. Fingar, "[i]s it possible to have Jeffrey Dunker hold off on assignment of the Linux course?"   (*See* Dkt. 58-6 at 17 (Exh. T)).   However, Plaintiff

presents no evidence that Ms. Fingar agreed to communicate this request to Dunker, or that she in fact did communicate the request to Dunker.  In response to Plaintiff's argument, Dunker submitted a reply declaration, again reiterating that his assignment of courses on a rolling basis was his "normal process for scheduling courses," and that "no full-time, part-time or adjunct faculty has ownership over any course," and that he never received any request from Ms. Fingar with respect to the assignment of the Intro to Linux course.  (*See* Dkt. 59-1).  In sum, the Court does not find that this email creates a material issue of fact with respect to Plaintiff's retaliation claims, and Defendants are entitled to summary judgment on these claims.

### III.    <u>Breach of Contract Claim Against MCC</u>

Plaintiff also brings a claim for breach of contract against MCC, including because the applicable collective bargaining agreements demonstrate that he should have received individual notification for the full-time faculty positions in 2017.  (*See* Dkt. 58 at 7; *see also* Dkt. 1 at 10).  There are four elements for a breach of contract claim under New York law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015 (same).

MCC is entitled to summary judgment on Plaintiff's breach of contract claim for several reasons.[6]  First, it is undisputed that Plaintiff was a member of the union, and as a member of a union subject to a collective bargaining agreement, he lacks standing to bring a breach of contract action against MCC.  *See, e.g.*, *Cummings v. City of N.Y.*, No. 19-cv-7723 (CM)(OTW), 2020 WL 882335, at *14 (S.D.N.Y. Feb. 24, 2020) ("By becoming a union member, an individual employee 'has no individual rights under a collective bargaining agreement which he can enforce against his employer except through the union.'" (quoting *Berlyn v. Bd. of Educ. of E. Meadow Union Free Sch. Dist.*, 80 A.D.2d 572, 573 (2d Dep't 1981)); *see also Ahmad v. N.Y.C. Dep't of Educ.*, No. 18-cv-3494 (HG) (LB), 2023 WL 2734628, at *4-5 (E.D.N.Y. Mar. 31, 2023) (where the plaintiff alleged violations of a CBA between the Department of Education and his union, including that he was forced to work during his free period, was pressured into giving a passing grade to a student, and that he was not paid his proper salary during one week, dismissing claim and explaining that the plaintiff lacked standing to assert a breach of contract between the DOE and the union); *Murray v. Town of N. Castle*, 203 A.D.3d 150, 175 (2d Dep't 2022) ("As a general proposition, when an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract" (citation omitted)); *Wilson v. Bd. of Educ. of City*

---

[6]     MCC failed to seek dismissal of Plaintiff's breach of contract claim in connection with its motion to dismiss.  Accordingly, the Court permitted that claim to proceed to discovery.  (*See* Dkt. 24 at 28).

*of N.Y.*, 261 A.D.2d 409, 409 (2d Dep't 1999) ("[S]ince the petitioner was a 'party' to neither the collective bargaining agreement nor the arbitration, she lacks standing to seek vacatur of the arbitrator's award.").

Even if Plaintiff could claim a breach of contract against MCC, he is foreclosed from doing so because the applicable collective bargaining agreements provide a grievance procedure for alleged breaches to the agreement.

> It is well settled that, when an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract. There are two exceptions to that rule. The first exception applies when the contract provides otherwise . . . , i.e., the contract either expressly allows such suits or implicitly does so by excluding the dispute at issue from, or not covering it within, the ambit of the contractual dispute resolution procedures. The second exception applies when the union fails in its duty of fair representation . . . , but the employee must allege and prove that the union breached its duty to provide fair representation to the employee.

*Armstrong v. Town of Tonawanda*, 214 A.D.3d 1304, 1304-05 (4th Dep't 2023) (quotations and citations omitted).

Both the 2015 CBA and 2018 CBA contain a grievance procedure for addressing any "violation, misinterpretation or inequitable application of any of the provisions of this Agreement" through a complaint "by any person covered by this Agreement." (*See* declaration of Tammy Kieper, Exhs. A & B, Article 44 (Dkt. 55-19 at 47; Dkt. 55-20 at 47)). Article 32 of the CBA covers the procedure for adjunct faculty course assignments, as well as advertisements for full-time positions. (Dkt. 55-19 at 39-42; Dkt. 55-20 at 39-42). In other words, the CBA does not expressly allow union members to bring a lawsuit as to these issues, but rather requires them to resolve the grievance internally, including by

submitting to arbitration.  (Dkt. 55-19 at 48-49; Dkt. 55-20 at 48-49).  Further, the second exception does not apply, since Plaintiff has not alleged, nor is there any evidence, that the union breached its duty to provide fair representation to Plaintiff.[7]

Finally, there is no issue of fact as to whether any breach of contract occurred.  The evidence before the Court shows that Dunker assigned courses in compliance with the 2015 and 2018 CBA.  Plaintiff's belief that he was somehow entitled to teach the "Intro to Linux" course is incorrect and not supported by either of the applicable contracts.  Further, MCC appropriately posted the Fall 2017 full-time position advertisements on its website as well as on several other posting sites.  Plaintiff has failed to offer any evidence demonstrating that there is an issue of fact with respect to his breach of contract claim against MCC.  Accordingly, MCC is entitled to summary judgment on Plaintiff's breach of contract claim.

---

[7]     Even if Plaintiff had attempted to claim that the union breached its duty of fair representation, he has already litigated this claim against the union before the PERB, and it was dismissed after a full hearing.  (*See* Dkt. 55-18 at ¶¶ 24-25 & Dkt. 55-23).  Plaintiff would therefore be collaterally estopped from raising the fair representation issue again in this case.  *Scott v. Goodman*, 961 F. Supp. 424, 434 (E.D.N.Y. 1997) (plaintiffs estopped from relitigating issue in instant action, as virtually identical issue was decided in PERB hearing), *aff'd*, 191 F.3d 82 (2d Cir. 1999); *Yoonessi v. New York*, 289 A.D.2d 998, 999-1000 (4th Dep't 2001) (barring the plaintiff from re-litigating his claim based on the union's breach of duty of fair representation, since that claim was previously litigated and resolved before the PERB).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 55) is granted, and Plaintiff's complaint is dismissed.  The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 3, 2024
         Rochester, New York